## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **APPLEGATE, LP,** *et al.*, | * | |
| **Plaintiffs** | * | |
| **v.** | * | **CIVIL NO. JKB-15-2589** |
| **CITY OF FREDERICK, MARYLAND,** | * | |
| **Defendant** | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Applegate, LP; Country Hill, LP; College Estates, LP; Fredwood, LLLP; Home Properties Hunters Glen, LLC; and Home Properties Elmwood Terrace, LLC ("Plaintiffs") brought an action against the City of Frederick, Maryland ("Defendant" or "the City") in the Circuit Court for Frederick County (Civ. No. 10-C-15-002035).   Thereafter, Defendant filed a notice of removal, invoking this Court's federal-question jurisdiction pursuant to 28 U.S.C. § 1441(a).   Now pending before the Court are Plaintiffs' Motion for Good Cause to Proceed Pursuant to the Local Government Tort Claims Act ("Motion to Proceed") (ECF No. 19); Plaintiffs' Motion for Leave to File Second Amended Complaint ("Motion to Amend") (ECF No. 40); and Defendant's Motion to Dismiss the Amended Complaint or, in the Alternative, for Summary Judgment ("Motion to Dismiss") (ECF No. 26).[1]   The issues have been briefed, and no hearing is required, *see* Local Rule 105.6 (D. Md. 2014).   For the reasons explained below,

---

[1] The Court will construe Defendant's motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Hart v. Lew*, 973 F. Supp. 2d 561, 572 (D. Md. 2013) ("[A] motion styled in the alternative, *i.e.*, to dismiss or for summary judgment, implicates the court's discretion . . . to consider matters outside of the pleadings.   A district judge has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" (citation omitted) (quoting 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1366 (3d ed. 2004))).

Plaintiffs' Motion to Proceed will be DENIED WITHOUT PREJUDICE; Plaintiffs' Motion to Amend will be DENIED IN PART and DENIED WITHOUT PREJUDICE IN PART; Defendant's Motion to Dismiss will be GRANTED IN PART; and the case will be REMANDED to state court.

## I.    *Background*[2]

Plaintiffs are business entities that own certain apartment complexes located in Frederick, Maryland.  The complexes owned by Applegate, Country Hill, College Estates, and Fredwood are managed by the Maryland Management Company ("MMC"), while the complexes owned by Hunters Glen and Elmwood Terrace are managed by Home Properties, LP.  (ECF No. 29 at 1-2.)

The City maintains a municipal water and sewer system.  Pursuant to section 25-19 of the city code, billing installments and rates are established "by resolution of the mayor and board of aldermen."  Acting under this authority, the City adopted Resolution No. 02-32 on August 1, 2002,[3] establishing a five-tier progressive billing structure.  (ECF No. 2 at 19.)[4]  The rates applied in "all cases where water meters [we]re installed."  (*Id.* at 18.)  As a practical matter, this progressive structure meant that large complexes with multiple units served by a single water meter were billed at a higher rate than single-family homes with individual meters.

Plaintiffs allege that "[s]ometime between August 1, 2002[,] and July 1, 2004, various condominium associations within the City . . . requested relief from the application of the . . . five-tiered progressive rate structure."  (ECF No. 29 ¶ 22.)  According to Plaintiffs, these

---

[2] The facts are recited here as alleged by Plaintiff, this being a motion to dismiss.  *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

[3] Although Plaintiffs' Amended Complaint purports to incorporate certain exhibits—including the resolutions cited in this Memorandum—no exhibits were attached to the Amended Complaint.  The Court thus references the original Complaint, to which the exhibits were properly attached.

[4] The first 6000 gallons metered in a quarter were billed at $1.54.  Monthly gallonage greater than 6000 but less than 13,000 was billed at $2.13 per 1000 gallons; monthly gallonage greater than 13,000 but less than 24,000 was billed at $2.25 per 1000 gallons; monthly gallonage greater than 24,000 but less than 32,000 was billed at $2.35 per 1000 gallons; and monthly gallonage greater than 32,000 was billed at $2.55 per 1000 gallons.  (ECF No. 2 at 19.)

associations lobbied the "Department of Water and Sewer" ("DWS")[5] to "allow each condominium unit to be considered a separate billing unit within a multi-unit building." (*Id.*) The DWS complied with the associations' demands; rather than securing a formal amendment of Resolution No. 02-32, the DWS allegedly approved the change "privately and secretly . . . in conjunction with the adoption of the Fiscal Year 2005 Budget." (*Id.* ¶ 23.) As a result of this change (the "Multi-Residential Discount"), condominiums were billed on a per-unit basis "even though all owners . . . used the same *single* meter." (*Id.*) Plaintiffs speculate that "no public hearings" were held in connection with the adoption of the Multi-Residential Discount. (*Id.* ¶ 24.) However, it appears from the public record that the discount was discussed at an open workshop hosted by the Mayor and the Board of Aldermen ("the Board") on May 7, 2003, and that it was implemented at a similarly open session on May 20, 2004. (*See* ECF Nos. 26–2 & 26–3.)[6]

On August 5, 2013, the president of MMC learned about the Multi-Residential Discount while discussing water pricing with DWS officials. (ECF No. 29 ¶ 29.) Thereafter, on January 29, 2014, Plaintiffs' counsel delivered a memorandum to the Mayor and the Board that addressed the City's allegedly "disparate and discriminatory billing practices for water rents between condominiums and apartment buildings." (*Id.* ¶ 30.) These City officials seem to have taken Plaintiffs' concerns to heart: on May 15, 2014, the City adopted Resolution No. 14-11, which

---

[5] The City observes that there is no "Department of Water and Sewer" in Frederick, Maryland; rather, the City maintains a Department of Public Works that includes subunits for such activities as water distribution and sewer collection. (ECF No. 26–1 at 8 n.3.) In the interest of consistency, and strictly for the purpose of resolving the pending motions, the Court will adopt Plaintiffs' vernacular.

[6] Defendant attached minutes from the 2003 and 2004 meetings to its Motion to Dismiss. Although the Court's analysis at the pleading stage is generally constrained to the complaint and documents incorporated therein, the Court may also consider matters of public record in testing the sufficiency of the complaint. *See Haley v. Corcoran*, 659 F. Supp. 2d 714, 721 n.4 (D. Md. 2009) ("A district court may take judicial notice of 'matters of public record' without converting a Rule 12(b)(6) motion into a motion for summary judgment."). Courts routinely consider minutes from public meetings in conducting Rule 12(b)(6) analyses. *See Vestavia Plaza, LLC v. City of Vestavia Hills*, No. 2:11-cv-4152-TMP, 2013 WL 4804196, at *2 (N.D. Ala. Sept. 9, 2013); *Quick Cash of Westchester Ave. LLC v. Village of Port Chester*, No. 11-CV-5608 (CS), 2013 WL 135216, at *4 (S.D.N.Y. Jan. 10, 2013); *Narayanan v. Nev. ex rel. Bd. of Regents*, No. 3:11-cv-00744-LRH-VPC, 2012 WL 4076163, at *1 n.2 (D. Nev. Sept. 10, 2012); *see also Schubert v. City of Rye*, 775 F. Supp. 2d 689, 695 n.3 (S.D.N.Y. 2011) (collecting cases).

provides that water rates for multifamily properties with a single meter are calculated based on the total amount of water flowing through that meter regardless of the number of units served. (ECF No. 2 at 22.)

Plaintiffs acknowledge that Resolution No. 14-11 "effectively eliminated the unfair billing practices between condominiums and apartment buildings."   (ECF No. 29 ¶ 33.) Nevertheless, on July 20, 2015, Plaintiffs filed a six-count action in the Circuit Court for Frederick County, alleging breach of contract (Count I), breach of good faith (Count II),[7] unjust enrichment (Count III),[8] and violations of the Fourteenth Amendment (Count IV) and Article 24 of the Maryland Declaration of Rights (Count V); Plaintiffs also included a request for declaratory judgment (Count VI).  (ECF No. 2.)[9]  On October 23, 2015, Plaintiffs filed a Motion to Proceed (ECF No. 19); Defendants filed a Motion to Dismiss on November 16, 2015 (ECF No. 26).  Then, on January 6, 2016, while those motions remained pending, Plaintiffs moved to amend.  (ECF No. 40.)  All motions are fully briefed and are ripe for decision.

## II.  *Plaintiffs' Motion to Amend (ECF No. 40)*

### A.  *Standard of Review*

Because the Court has not entered a scheduling order in this matter, Plaintiffs' Motion to Amend is governed by the liberal standard of Rule 15(a)(2) of the Federal Rules of Civil Procedure.  Rule 15(a)(2) instructs district courts to "freely give leave" to amend "when justice so requires."  Even so, a court may deny a motion to amend if (1) the movant has acted in bad faith, (2) the new pleading would prejudice the nonmovant, or (3) the new pleading would be

---

[7] In their opposition brief, Plaintiffs concede that Count II is a "reverberation" of Count I.  (*See* ECF No. 33 at 29.)  *Cf. Mount Vernon Props., LLC v. Branch Banking & Tr. Co.*, 907 A.2d 373, 382 (Md. Ct. Spec. App. 2006) ("[N]o independent cause of action at law exists in Maryland for breach of the implied duty of good faith and fair dealing.").

[8] Plaintiffs pleaded unjust enrichment in the alternative, "should the validity of the Contracts be in dispute."  (ECF No. 29 at 10.)

[9] Plaintiffs retained these six counts in their Amended Complaint, which was docketed on November 16, 2015.  (*See* ECF No. 29.)

4

futile. *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (citing *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986)). Given the early stage of this litigation and the absence of any indicia of bad faith on the part of Plaintiffs, the Court directs its attention to the third factor identified in *Laber*: futility. A futile amendment is one that could not withstand a motion to dismiss pursuant to Rule 12(b)(6). Thus, a futile amendment is one that fails to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In evaluating the plausibility of a claim, the Court construes all facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). Even so, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557).

### B. Analysis

In their Motion to Amend, Plaintiffs propose two new counts for violations of the Fourteenth Amendment's procedural due process requirements and of section 25-19 of the Code of the City of Frederick. Because the Court declines to exercise supplemental jurisdiction over any of Plaintiffs' state-law claims, *see infra* Part III.B, the Court confines its analysis here to Plaintiffs' constitutional theory.

The Due Process Clause of the Fourteenth Amendment prohibits states and state actors from "depriv[ing] any person of life, liberty, or property, without due process of law." The Due Process Clause includes both substantive and procedural components. Procedural due process

"prevents mistaken or unjust deprivation" of a protected property interest; it requires "fair notice of impending state action and an opportunity to be heard." *Snider Int'l Corp. v. Town of Forest Heights*, 739 F.3d 140, 145-46 (4th Cir. 2014), *cert. denied*, 134 S. Ct. 2667 (2014). Plaintiffs allege that the City deprived them of their "protected property interest in their money" by "overcharging Plaintiffs water rents, without due process of law, by secretly bypassing [*sic*] the 'Multi-Residential' discount through the fiscal 2005 budget." (ECF No. 40–1 ¶¶ 75-76.) Plaintiffs' theory fails for several reasons.

First, the City action of which Plaintiffs complain is not the sort of action that implicates individual due process rights. Over a century ago, Justice Oliver Wendell Holmes, Jr., wrote that "[w]here a rule . . . applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption," and that legislative bodies may constitutionally implement general policies that "affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard." *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915). Following *Bi-Metallic*, courts have consistently recognized that official action that is legislative in nature is not subject to the notice-and-hearing requirements of due process; those requirements apply "only where the official action is 'designed to adjudicate disputed facts in particular cases.'" *Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 142 (2d Cir. 1994) (quoting *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973)); *see also Barefoot v. City of Wilmington*, 306 F.3d 113, 124 (4th Cir. 2002) ("When a legislature passes a law which affects a general class of persons, the political process provides all the process that is due."), *abrogated on other grounds as recognized in Davani v. Va. Dep't of Transp.*, 434 F.3d 712 (4th Cir. 2006); *Richardson v. Town of Eastover*, 922 F.2d 1152, 1158 (4th Cir. 1991) ("[I]f a town's action is legislative, an affected party has no right to notice and an

opportunity to be heard."); *Common Cause of Pa. v. Pennsylvania*, 447 F. Supp. 2d 415, 432 (M.D. Pa. 2006) ("It is black letter law that there is no actionable constitutional right to due process in the manner in which legislation affecting a broad class of society is enacted."), *aff'd*, 558 F.3d 249 (3d Cir. 2009).  The Multi-Residential Discount at issue here was a general policy that redounded to the benefit of a broad class of City residents; it worked no special advantage on favored condominium owners nor inflicted any singular detriment on disfavored apartment owners.  The discount was a typical legislative action by a local governing body; thus, the process to which Plaintiffs were constitutionally due was the process their partners and members enjoyed at the ballot box.

Alternatively, even if the City's action here could have triggered some kind of due process protection, Plaintiffs have not adequately pleaded that the City's action deprived them of a protected property interest.  "In assessing a procedural due process claim, '[u]nless there has been a "deprivation" [of a protected liberty or property interest] by "state action," the question of what process is required . . . is irrelevant, for the constitutional right to "due process" is simply not implicated.'"  *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 146 (4th Cir. 2009) (alterations in original) (quoting *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 (4th Cir. 1988)).  Plaintiffs are undoubtedly correct that they have a protected interest in their money—but taking Plaintiffs' well-pleaded allegations at face value, it does not appear that the complained-of action *deprived* them of their money.  They do not allege that they were charged a meter rate greater than or inconsistent with the rates prescribed by Resolution No. 02-32 and its successors, nor do they claim that they were denied the utility service for which

they paid.     Rather, the losses Plaintiffs believe they have sustained[10] relate to the
Multi-Residential Discount that condominium owners received.  Had Plaintiffs qualified for that
discount, they would have paid a lower rate over the roughly ten-year period during which it was
in effect.  But Plaintiffs cite no authority—and the Court is aware of none—for the proposition
that a party can claim a constitutionally protected interest in a perquisite extended to a *different*
party by a government entity.  On the contrary, it is settled law that "[t]o have a property interest
in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have
more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement
to it."  *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).  Because Plaintiffs had no legitimate
claim of entitlement to utility service at a discounted rate, they cannot plausibly allege that they
were deprived of property when they were billed at the ordinary rate.

Finally, even if Plaintiffs could somehow demonstrate that they were deprived of a
protected interest, such deprivation does not by itself amount to a Fourteenth Amendment
violation.  Rather, Plaintiffs must show that the procedures giving rise to the deprivation were
"constitutionally inadequate"—*i.e.*, that Plaintiffs were denied notice and an opportunity to be
heard.  *Iota Xi Chapter*, 566 F.3d at 145.  Notice must be "reasonably calculated to convey
information concerning a deprivation," while the hearing requirement is flexible, taking into
account a "balancing of the private interest and the public interest, along with 'the risk of an
erroneous deprivation of such interest through the procedures used, and the probable value, if
any, of additional or substitute procedural safeguards.'"  *Snider Int'l Corp.*, 739 F.3d at 146
(quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).  Here, as the public record makes
plain, the Multi-Residential Discount was implemented after two open meetings of the Mayor

---

[10] With the exception of Country Hill, whose properties are rent-controlled, Plaintiffs admit that they passed along
their water costs to their tenants in the form of increased rent.  (*See* ECF No. 29 ¶¶ 36, 38).  It is thus unclear to what
extent Plaintiffs themselves were disadvantaged by the uneven application of the Multi-Residential Discount.

and the Board.  At the May 7, 2003, session, a city official discussed the utility-rate issue in some detail, and members of local condominium associations offered comment.  (*See* ECF No. 26–2.)  At the May 20, 2004, session, comments were received on several topics, but it appears that no comments were addressed to utility rates or the proposed discount.  (*See* ECF No. 26–3.)  The open nature of these proceedings undercuts Plaintiffs' characterization throughout their Amended Complaint that the discount was implemented "secretly":  Plaintiffs could have participated in the decisionmaking process had they simply kept abreast of the goings-on of local government.[11]  Furthermore, if at any point Plaintiffs felt that they were overpaying for their water service, they could have invoked a procedure built into the Code of the City of Frederick:

> Whenever any consumer of water shall report to the city treasurer that he does not have as many fixtures as he is charged with, or that some of the fixtures have been disconnected, *or that the amount charged against him is excessive*, the city treasurer shall notify the superintendent, who shall forthwith make an investigation of the premises and report his findings to the city treasurer, and the city treasurer shall make such adjustments in the account of any such consumer as may be necessary to conform with the provisions of [the Code].

Frederick, Md., Code § 25-11 (emphasis added).   "[A] procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies."  *Kendall v. Balcerzak*, 650 F.3d 515, 530 (4th Cir. 2011) (alteration in original) (quoting *Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 423 (3d Cir. 2008)); *cf. Mora v. City of Gaithersburg*, 519 F.3d 216, 230 (4th Cir.

---

[11] Plaintiffs denounce the Board's use of a budget vote to implement the Multi-Residential Discount, rather than an independent resolution as the city code appears to prescribe.  *See* Frederick, Md., Code § 25-19(b) ("The rates of water rent . . . shall be established by resolution of the mayor and board of aldermen.").  However, it is not clear what difference the Board's use of a budget vote versus a freestanding resolution might have made:  had Plaintiffs attended either of the open meetings at which the water-rate issue was addressed, they could have expressed whatever dissenting views they might have held.  Moreover, assuming *arguendo* that the City breached a technical requirement of its code through its implementation of the discount, such a breach likely does not constitute a due process violation.  *See Riccio v. County of Fairfax*, 907 F.2d 1459, 1469 (4th Cir. 1990) ("[T]o hold that a state violates the Due Process Clause every time it violates a state-created rule regulating the deprivation of a property interest would contravene the well[-]recognized need for flexibility in the application of due process doctrine. . . . Alleged violations of due process . . . are to be measured against a federal standard of what process is due and that standard is not defined by state-created procedures . . . .").

2008) ("[Plaintiff] has had, and continues to have, notice and an opportunity to be heard in Maryland, and he cannot plausibly claim that Maryland's procedures are unfair when he has not tried to avail himself of them.").[12]

Because Plaintiffs' proposed claim for a procedural due process violation is futile, the Court will DENY their Motion to Amend with respect to that count. But because the Court declines to consider Plaintiffs' state-law theories, it will DENY WITHOUT PREJUDICE their Motion to Amend with respect to the alleged violation of the city code; Plaintiffs may seek leave to plead that count in state court if they so choose.

### III. Defendant's Motion to Dismiss (ECF No. 26)[13]

#### A. Fourteenth Amendment Equal Protection (Count IV)

Plaintiffs claim that the Multi-Residential Discount, as applied to owners of condominiums but not to owners of apartment buildings, violated the Equal Protection Clause of the Fourteenth Amendment because there is "no rational basis for distinguishing between . . . condominiums and apartment buildings . . . if the true stated goal of Resolution No. 02-32 was to provide water and 'to insure adequate revenues and fair application for all users.'" (ECF No. 29 ¶ 58.)[14] Plaintiffs purportedly bring their equal protection challenge pursuant to 42 U.S.C. §§ 1981, 1983.[15]

---

[12] The fact that the City responded promptly to Plaintiffs' concerns in 2014 and ultimately *revoked* the Multi-Residential Discount suggests that the City's procedures were more than adequate: as Plaintiffs themselves admit, "Resolution No. 14-11 . . . effectively eliminated the unfair billing practices." (ECF No. 29 ¶ 33.)

[13] The standard of review for a motion to dismiss pursuant to Rule 12(b)(6) is equivalent to the standard that the Court has employed in analyzing the futility of Plaintiffs' proposed procedural due process count—*i.e.*, the Court examines Plaintiffs' well-pleaded allegations to determine whether Plaintiffs have stated a plausible claim for relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[14] Plaintiffs derive this "true stated goal" from a line in Resolution No. 02-32, which indicates that the rates would be reviewed after roughly a year to insure adequate revenues and fair application. (ECF No. 2 at 19.)

[15] Plaintiffs' invocation of § 1981 is puzzling. That statute prohibits race-based discrimination in contract formation/enforcement and judicial proceedings, *see Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253, 257 (4th Cir. 2001); *Candillo v. N.C. Dep't of Corr.*, 199 F. Supp. 2d 342, 353-54 (M.D.N.C. 2002), yet Plaintiffs make no allegations of race discrimination whatsoever in their Amended Complaint. The Court therefore assumes that Plaintiffs' reference to § 1981 was inadvertent.

The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.[16]   The Clause does not forbid most forms of unequal treatment, because "[l]awmaking by its nature requires that legislatures classify, and classifications by their nature advantage some and disadvantage others." *Helton v. Hunt*, 330 F.3d 242, 245 (4th Cir. 2003).   Rather, the Clause forbids only truly arbitrary distinctions among groups that are similar in "all respects relevant to attaining the legitimate objectives of legislation." *Van Der Linde Hous., Inc. v. Rivanna Solid Waste Auth.*, 507 F.3d 290, 293 (4th Cir. 2007).   To make out a *prima facie* case for an equal protection violation, the plaintiff must plausibly allege that "he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).   "The 'similarly situated' standard requires a plaintiff to identify persons materially identical to him . . . who ha[ve] received different treatment." *Kolbe v. Hogan*, 813 F.3d 160, 185 (4th Cir. 2016), *reh'g granted*, No. 14-1945, 2016 WL 851670 (4th Cir. Mar. 4, 2016) (mem.); *see also LaBella Winnetka, Inc. v. Village of Winnetka*, 628 F.3d 937, 942 (7th Cir. 2010) ("To be considered 'similarly situated,' a plaintiff and his comparators . . . must be identical or directly comparable in all material respects.").

If the plaintiff demonstrates that he is similarly situated to his comparators, the court will next analyze the classification at issue with the appropriate degree of means-ends scrutiny. While suspect and quasi-suspect classifications, such as those based on race or gender, warrant heightened scrutiny, economic classifications are subject to rational-basis review. *See Heller v. Doe ex rel. Doe*, 509 U.S. 312, 319-20 (1993) ("[A] classification neither involving fundamental

---

[16] It is well-settled that a business entity may constitute a "person" under the Equal Protection Clause. *See Santa Clara County v. S. Pac. R.R. Co.*, 118 U.S. 394 (1886).

rights nor proceeding along suspect lines is accorded a strong presumption of validity. Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." (citations omitted)). In conducting rational-basis review, a court need not divine the actual, contemporaneous intent of the lawmakers responsible for the classification; rather, the classification will be deemed valid so long as the "legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992) (citations omitted); *see also Armour v. City of Indianapolis*, 132 S. Ct. 2073, 2080 (2012) ("[I]t falls within the scope of our precedents holding that there is . . . a plausible reason [for a classification] if 'there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" (citation omitted)); *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008) ("[T]he State has no obligation to produce evidence to support the rationality of [a classification], which 'may be based on rational speculation unsupported by any evidence or empirical data.'" (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993))).[17]

Plaintiffs here fail both prongs of the equal protection analysis. First, they have not adequately pleaded that they are similarly situated with their comparators—*i.e.*, condominium owners. Plaintiffs are, by their own admission, limited partnerships and limited liability companies that own large apartment compounds: in other words, they are commercial ventures. By contrast, their comparators—condominium owners—are presumably owner-occupiers who

___

[17] At the Rule 12(b)(6) stage, while the Court takes as true all well-pleaded allegations in the complaint, it construes those allegations in light of the deferential rational-basis standard. "To survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications." *Giarratano v. Johnson*, 521 F.3d 298, 304 (4th Cir. 2008) (quoting *Wroblewski v. City of Washburn*, 965 F.2d 452, 460 (7th Cir. 1992)).

are more akin to private homeowners or townhome owners than they are to business ventures.[18]
*See Timberland Partners XXI, LLP v. Iowa Dep't of Revenue*, 757 N.W.2d 172, 176-77 (Iowa 2008) ("A condominium is typically occupied by the owner whereas an apartment is always a commercial enterprise.  The primary use of each is dissimilar. . . . As a result, apartments are not similarly situated to condominiums." (citation omitted)).    Because Plaintiffs and their comparators are not "materially identical," *Kolbe*, 813 F.3d at 185, Plaintiffs have not pleaded a *prima facie* case for an equal protection violation.

Moreover, even if Plaintiffs could somehow show that they were similarly situated to condominium owners, their claim would still fail because the City can articulate a rational basis for its classification.  Specifically, the City proffers that the Multi-Residential Discount had the "net effect of making the rate structure more fair among the class of individual residential property owners."  (ECF No. 26–1 at 26.)  That explanation is perfectly plausible:  indeed, municipalities routinely distinguish between residential and commercial property and property owners in their policymaking, whether through zoning, taxes, special assessments, or the provision of city services.  It is rational (regardless of whether it is optimal policy) for a municipality to adjust its utility rates so as to treat residential property owners alike.[19]

In their opposition brief, Plaintiffs cite a pair of old Maryland cases addressing the provision of utility services, neither of which expressly invokes federal equal protection doctrine.

---

[18] Plaintiffs do not allege that any of these condominium owners are engaged in commercial real-estate investment.

[19] Plaintiffs observe that, in Resolution No. 14-11, the City acknowledged that the "only distinction" supporting its classification was the "ownership structure of the buildings/units."  (ECF No. 33 at 25.)  From this acknowledgement, Plaintiffs surmise that Defendant "specifically acknowledged its disparate and discriminatory billing of water rates."  (*Id.*)  Plaintiffs' rather dubious characterization aside, City officials may well have concluded in 2014 that the Multi-Residential Discount was no longer suitable policy.  That is not relevant, however, to the Court's analysis:  the only question for purposes of equal protection is whether the discount constituted an irrational difference in the treatment of two similarly situated groups.  *Cf. Van Der Linde Hous., Inc. v. Rivanna Solid Waste Auth.*, 507 F.3d 290, 295 (4th Cir. 2007) ("[T]he Equal Protection Clause does not require the government to pursue a sound economic policy, only one that does not offend entrenched constitutional principles. Nor does it require that the methods by which the government pursues those policies be particularly palatable . . . so long as they are not completely arbitrary.").

In *Lewis v. Mayor & City Council of Cumberland*, 54 A.2d 319, 323 (Md. 1947), the Court of Appeals of Maryland *rejected* the plaintiff's argument that a minimum service charge calculated by multiplying a fixed rate by the number of units in an apartment building was unreasonable or discriminatory; the court opined that a rate ordinance is "presumed to be reasonable and valid, until the contrary is shown," and that the propriety of a service charge turns not only on rate of consumption but on a host of other factors such as the nature of the use, the interests of the property owners, and the revenue-generating goals of the municipality.  In *Home Owners' Loan Corp. of Wash., D.C. v. Mayor & City Council of Balt.*, 3 A.2d 747, 749 (Md. 1939), the Court of Appeals held that a utility provider could not refuse service to a landowner on the basis of unpaid charges attributable to the prior landowner, where the charges were "not a lien on the land but a personal debt of the then owner."  *Id.* at 752.  It is unclear what bearing the holding of *Home Owners' Loan Corp.* could possibly have on the case at bar; in any event, the broad principles recited in these antiquated state-law cases do nothing to undercut the Court's conclusion that the Multi-Residential Discount was not unconstitutionally arbitrary.[20]

Because Plaintiffs have not demonstrated that they are similarly situated to condominium owners and because, in any event, the City has proffered a rational basis for implementing the Multi-Residential Discount, Count IV must be DISMISSED.[21]

---

[20] Plaintiffs separately complain that, apart from addressing the Multi-Residential Discount in its brief, Defendant has not "offered any basis . . . suggesting why the discount was implemented," and Plaintiffs propose that they are entitled to "explore whether there was, in fact, a rational basis related to the furtherance of a legitimate government interest."  (ECF No. 33 at 28.)  Plaintiffs apparently misapprehend rational-basis review.  The burden rests on *them* to "negat[e] *every conceivable basis* which might reasonably support the challenged classification."  *Van Der Linde Hous.*, 507 F.3d at 293 (emphasis added).  The City's policy decisions are not subject to judicial fact-finding and may be upheld on the basis of rational speculation alone.  *Id.*

[21] Having dismissed Count IV on substantive grounds, the Court does not address Defendant's separate theory that the claim is time-barred.

14

### B.     *State-Law Claims*

Having dismissed Plaintiffs' Fourteenth Amendment equal protection claim, and having denied Plaintiffs' motion to supplement their Amended Complaint with a procedural due process claim, the Court declines to exercise its supplemental jurisdiction over the remaining state-law claims.  *See* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a [state-law] claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction[.]"); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.  Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." (footnote omitted)); *Waybright v. Frederick County*, 528 F.3d 199, 209 (4th Cir. 2008) ("With all its federal questions gone, there may be the authority to keep [the case] in federal court . . . but there is no good reason to do so.").  Accordingly, the Court will REMAND this action to the Circuit Court for Frederick County, where the parties may litigate the remaining state-law matters:  the Court offers no comment on the timeliness or substantive merit of any of these claims.

## IV.  *Conclusion*

For the foregoing reasons, an Order shall enter DENYING WITHOUT PREJUDICE Plaintiffs' Motion to Proceed (ECF No. 19); DENYING IN PART and DENYING WITHOUT PREJUDICE IN PART Plaintiffs' Motion to Amend (ECF No. 40); GRANTING IN PART Defendant's Motion to Dismiss (ECF No. 26); and REMANDING THIS CASE to the Circuit Court for Frederick County.

DATED this 11th day of April, 2016.

BY THE COURT:

_____/s/_____

James K. Bredar
United States District Judge